**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert F. Lindley, Jr., | No. CV 18-01860-PHX-DGC (JFM) |
| Plaintiff, | |
| v. | **ORDER** |
| Corizon Health, et al., | |
| Defendants. | |

Plaintiff Robert F. Lindley, Jr., who is currently confined in the Arizona State Prison Complex (ASPC)-Lewis in Buckeye, Arizona, brought this civil rights action pursuant to 42 U.S.C. § 1983. Defendants Corizon Health ("Corizon") and Doctors Itoro Elijah and Utilization Management Team (UMT) Director Ayodeji Ladele move for summary judgment. (Doc. 119.) Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 121), and he opposes the Motion. (Doc. 124.) The Court will grant in part and deny in part the Motion for Summary Judgment.[1]

## I.    Background

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Eighth Amendment medical care claims against Corizon, Dr. Elijah, and three unidentified "Doe" Defendants and directed Defendants Corizon and Elijah to answer the claims and

---

[1] Defendants did not file a Reply to Plaintiff's Response, and the time to do so has elapsed.

gave Plaintiff 120 days to identify and provide the names of the Doe Defendants. (Doc. 7.) The Court subsequently dismissed the Doe Defendants because the time to identify them had expired, but it permitted Plaintiff to amend his complaint to add UMT Director Ladele and required Defendants Corizon, Elijah, and Ladele to answer the First Amended Complaint. (Doc. 88.)[2]

## II.     Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see Fed. R. Civ. P. 56(c)(1).

---

[2] Defendants did not file a Reply to Plaintiff's Response, and the time to do so has elapsed.

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III.    Facts**

In June 1990, Plaintiff was diagnosed with an arachnoid cyst in the left temporal lobe of his brain and had a shunt placed for drainage to help reduce headaches and seizures. (Doc. 87 at 3.)[3] In 1995, Plaintiff was "sucker punched" on the left ear, and an MRI showed the shunt had become displaced, with later MRIs showing subsequent growth of the cyst. (*Id.*) In 2012, while Plaintiff was incarcerated and under the care of Wexford Medical, Dr. Marco N. Marsella determined that Plaintiff's cyst was not "class 3, exerting mass" or large enough to require treatment, but he recommended MRIs every two years for monitoring, and Nurse Practitioner (NP) Carrie Smalley set this up. (*Id.* at 3−4.)

On November 14, 2016, Defendant Dr. Elijah ordered an MRI for Plaintiff's cyst, and the MRI, taken on December 8, 2016, showed "no interval change in size" of the arachnoid cyst from the previous August 14, 2015 MRI. It also showed "[m]oderate ethmoid and mild maxillary sinusitis and a new "sphenoid sinus mucous retention cyst." (Doc. 120 (Defs.' Statement of Facts) ¶ 1; Doc. 120-1 at 3.)

On February 5, 2017, Plaintiff reported to medical that, while doing pull-ups, he felt a "pop" in his left chest wall and felt dizzy and light-headed. (*Id.* ¶ 2.) Plaintiff was seen by Nurse Michael Chailand, who noted that he should rest more, use ibuprofen if pain increases, and return if symptoms increase. (*Id.*)

On February 9, 2017, Plaintiff submitted a Health Needs Request (HNR), reporting that he noticed that the shunt by his ear had been stretched out about 1/8 inch and requested

---

[3] Where necessary to establish relevant facts not otherwise set forth in the record, the Court has relied on Plaintiff's verified First Amended Complaint to the extent that the facts therein are based on Plaintiff's personal knowledge and would be admissible as evidence. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

that it be checked. (Doc. 120-1 at 11.) Plaintiff was seen on the Nurse Line and was "placed on Provider Line 2/13/17 for Dr. Elijah." (*Id.*)

On February 13, 2017, Plaintiff was seen by NP Hamda Awaal for chronic care for seizures. (*Id.* at 12.) NP Awaal noted that Plaintiff stated his seizures started when he suffered a head injury from being hit by a car at age 21 and that he "gets aura by way of dizziness and weakness before he gets the seizures." (*Id.*) Plaintiff disputes that he was hit by a car and states only that "it was another time and injury." (Doc. 126 (Pl.'s Statement of Facts) ¶ 3.) NP Awaal noted that Plaintiff's seizures were controlled, but Plaintiff had stopped taking his medications. NP Awaal's plan of care was for Plaintiff to follow up with the yard provider regarding shunt displacement and continue current therapies and monitoring of seizures through chronic care visits. (Doc. 120-1 at 14, 15.) NP Awaal also educated Plaintiff on lifestyle modifications, medication compliance, and smoking cessation. (*Id.* at 15.) According to Plaintiff, the seizure issue was different from the shunt issue, and he stopped taking his seizure medications because they were not working. (Doc. 126 ¶ 3.)

On March 31, 2017, Plaintiff was seen by Dr. Elijah for a scheduled sick call regarding the "pop" of his lower left rib while exercising, itching on his face two nights later, and his feeling like his shunt was stretched out and displaced. (Doc. 120-1 at 18.) Plaintiff told Dr. Elijah that his shunt had shifted in the 1990s when he was punched in the ear and that later MRIs showed the cyst was increasing over time. (*Id.*) Dr. Elijah noted that Plaintiff's most recent MRI showed no change since the previous MRI. (*Id.*) She also noted "no notable swelling or asymmetry to left face or neck"; "shunt easily palpable from left posterior auricular area along left lateral neck down to clavicle"; "no tenderness with palpation"; and "shunt appears unchanged upon exam from last eval." (*Id.*) She discussed with Plaintiff at length that his shunt was not clinically dislodged; there was no visible swelling, fluid collection, or thinning along the easily palpable tract; and the shunt would not get dislodged from normal daily activity. She increased Keppra for Plaintiff's seizures because Plaintiff stated it was not working. She also noted to follow up on Plaintiff's

optometry evaluation for his reported left eye pressure and to review his chart and order snacks as appropriate for his hypoglycemia.  (*Id.* at 18, 20.)

On May 3, 2017, Plaintiff was again seen by Dr. Elijah in the chronic care clinic, and he reported that he had stopped taking Keppra several months ago, had not had a seizure or increase in dizziness, and requested to be taken off Keppra and Meclizine. (Doc. 120 ¶ 5; Doc. 120-1 at 22.)  Dr. Elijah discontinued these medications per Plaintiff's request, stated that Plaintiff would now have to take Keppra from pill call, and noted that Plaintiff was "still adamant that there is a malfunction of his shunt w[ith] associated swelling to left neck." (Doc. 120-1 at 22, 25.)  Plaintiff states in his affidavit that he asked Dr. Elijah how his MRI from December 2016 was "going to be able to determine a 2-4-17 incident," and "[f]rom that point onward[, he] got <u>NO</u> physical examination or any treatment of symptoms or assessment tests to determine condition of shunt placement or if leakage had occurred because of 2-4-17 incident throughout the remainder of [Dr. Elijah's] service at Barchey Unit, Lewis Complex."  (*Id.*)

Dr. Elijah's objective notes from this visit state: "exam not performed due to [Plaintiff's] irritability and requested to leave." (*Id.* at 23.)  It is unclear from Dr. Elijah's notes who made the request for Plaintiff to leave—Dr. Elijah or Plaintiff—but Plaintiff denies that Dr. Elijah told him to leave because he was being irritable.  (Doc. 126 ¶ 5.)  He testifies in his affidavit, however, that "during one of Ms. Elijah M.D.'s medical visits with the Plaintiff, while Plaintiff was still trying to address 2-4-17 incident, Ms. Elijah, M.D. kicked Plaintiff out of her office[,] telling him he was being rude." (Doc. 125 ¶ 17.)  It is unclear from Plaintiff's affidavit testimony if this occurred on May 3, 2017 or during another visit.

Also during the May 3 chronic care visit, Dr. Elijah reviewed Plaintiff's fasting blood test, which was positive for hypoglycemia, noted that an appropriate diet was ordered, performed a Snellen eye test, and noted to reorder an optometry evaluation. (Doc. 120-1 at 22.)

On July 18, 2017, Plaintiff was again seen by Dr. Elijah in the chronic care clinic and he asked about his optometry evaluation and complained of congestion, which he stated had been going on since the trauma to the left side of his head he had previously reported. (Doc. 120 ¶ 6; Doc. 120-1 at 28.)  He also stated that he had been blacking out, which he thought was related to damage to his shunt.  (Doc. 120-1 at 28.)  Dr. Elijah educated Plaintiff that the blackouts could be due to seizures for which Plaintiff refused to take medication, and she ordered a Keppra lab test.  (*Id.* at 31.)  She noted that Plaintiff "became argumentative and repeatedly accused [her] of refusing to 'address his issues' regarding what he believes is a broken VP shunt." (*Id.* at 28.)  She reviewed her notes from her May 3, 2017 visit with Plaintiff, showing she had spoken to Plaintiff for 20 minutes and examined him regarding his concerns about shunt damage due to trauma to the head, and she "re-iterated that if he had a leak at the site of his reported trauma from then, [] there would be an outwardly noticeable abnormality as well as abnormality on clinical/physical exam," which his last evaluations had not shown, and there was no "identifiable abnormality on visual inspection today." (*Id.*)  Plaintiff refused to discuss his chronic care needs and seizures and elected to leave prior to completion of the visit, "stating that [Dr. Elijah was] refusing to do anything for him." (*Id.*)

On October 23, 2017, Plaintiff was seen by NP Curtis Bass for a chronic care visit for his hypertension and seizures, and he expressed concern that his shunt had been displaced while doing pull ups and reported having an unwitnessed seizure the previous week. (Doc. 120 ¶ 7; Doc. 120-1 at 34.)  NP Bass's objective notes state as to Plaintiff's head/face, "[s]inuses non-tender, temporal artery non-tender, atraumatic"; as to his nose, "[n]o deformities, congestion, mucous membranes moist, pink"; and as to his neck, "[s]upple, non-tender, no thyromegaly, nodes, JVD, bruits, carotids equal." (*Id.* at 34−35.) NP Bass's assessment notes state, "Clinically stable.  No recent labs.  Confusing case. HTN on MPL, but denies HTN.  Same for DM.  No current meds for either." (*Id.* at 35.) Under "Patient Education Notes," NP Bass wrote, "difficult to get a word in edgewise.

Minimal teaching opportunities." (*Id.* at 36.) NP Bass's plan of care included, "[r]esearch frequency of MRIs to monitor temporal cyst (most recent 2016)." (*Id.*)

On January 16, 2018, Plaintiff was again seen by NP Bass in the chronic care clinic, and he reported no seizures and that he could not recall his last seizure. (Doc. 120 ¶ 8.)

On February 12, 2018, Plaintiff was seen by NP Bass for follow up on an Alternative Treatment Plan (ATP), which called for a "more comprehensive exam before re-submitting MRI request."[4] (Doc. 120 ¶ 8.) NP Bass's subjective notes state that Plaintiff denied dizziness or balance/gait problems, but he "[r]eports intermittent episodes of vertigo lasting '5 minutes,' which require [him] to sit down or hold something"; that "these episodes are occurring more and more frequently"; and he "[r]eports left-sided 'tingling' and tinnitus increasing as well." (Doc. 120-2 at 5.) NP Bass's objective notes state, "Neck supple, trachea midline, no goiter/nodules, bruits. Shunt palpable behind left ear and down left neck. [Plaintiff] adamant about the presence of 'indentations' along length of shunt that 'didn't used to be there.'" (Doc. 120-2 at 5.) NP Bass's assessment notes state, "Ventricular shunt status . . . objectively unremarkable, but Plaintiff adamant about subjective distress." (*Id.* at 6.) NP Bass planned to "resubmit MRI request." (*Id.* at 6.)

On March 23, 2018, Plaintiff was seen by NP Bass for follow up on ATPs denying consult requests for orthotic shoes and an MRI, and Plaintiff "verbaliz[ed] intent to seek legal recourse." (*Id.* at 12.) The Consult Request Action related to the MRI stated,

> The medical necessity for repeat MRI of head for intermittent vertigo is not met. No evidence of neurological deficit or worsening severe headache or vomiting. Typically[,] sphenoid cysts do not cause vertigo and is an incidental finding. Last MRI was unimpressive. Exercise will not move [Plaintiff's] shunt. Consider Hall pike testing, review of [Plaintiff's] medications and short trial of meclizine.

---

[4] Defendants include in their facts that the ATP was in response to an MRI consult request submitted on January 28, 2018. (Doc. 120 ¶ 9.) A medical record in the corresponding exhibit confirms that a "Consult Encounter" was "generated by Consult Request Entry" that day (*see* Doc. 120-2 at 2), but there is no information about what this request was for or why it was submitted or any documentary evidence of an MRI request or an ATP, showing why an MRI was denied.

(*Id.* at 15.)[5]  The Consult Request Action does not indicate which staff member made this decision or what medical qualifications he or she had to do so.  (*Id.*)

On July 17, 2018, Plaintiff was seen by NP Lawrence Ende at the chronic care clinic, and he reported no shortness of breath, no feeling like he was passing out, no weakness, and dizziness only when moving from sitting to standing.  (Doc. 120 ¶ 11.)  NP Ende ordered x-rays to check the position of Plaintiff's shunt, and the x-rays, taken that day, showed that the "shunt catheter [wa]s unremarkable."  (*Id.*; Doc. 120-2 at 22.)

On September 27, 2018, Plaintiff was seen by NP Marie DeMello for complaints about his shunt.  (Doc. 120 ¶ 12.)  He claimed that, while working out in February 2016, he felt tension in the left side of his neck and in his chest/abdominal region where his shunt is placed, he experienced soreness and swelling for several weeks thereafter, had indentations on the left side of his neck, and started noticing increased headaches and passing out, with current symptoms of fatigue, loss of balance, and tremors that waxed and waned in severity.  (Doc. 120-2 at 26.)  NP DeMello's objective notes regarding Plaintiff's neck state,

> supple, no lymphadenopathy, palpable carotid pulses, no tenderness, no JVD.  Shunt palpated on left lateral neck from behind the ear to the clavicle notch, patient reports "indents"; I did palpate some of what he was describing on lateral mid neck portion of shunt tubing.

(*Id.*)  NP DeMello assessed "[v]entricular shunt status" and "[u]nspecified convulsions." (*Id.* at 27.)  Her plan notes called for an "MRI head/neck for VP shunt," "symptom management," and follow up as needed.  (*Id.* at 27−28.)

On October 8, 2018, Plaintiff submitted an HNR asking if the MRI request had been approved, and the response was that, per ADC policy, medical was unable to provide him appointment information.  (Doc. 120 ¶ 13.)

_____

[5] Plaintiff claims to dispute these facts, but he merely argues that his last MRI was irrelevant because it "was prior to the incident," and he claims he did have worsening headaches, but he points to no evidence that he made any medical providers aware of this fact prior to the ATP of his MRI consult request.  (Doc. 126 ¶ 10.)

On October 23, 2018, Plaintiff was again seen by NP DeMello for a chronic care appointment and to review the ATP of his MRI request. (Doc. 121-2 at 32.) The Consultation Request Action for the MRI stated, per M. Bartels, "Medical necessity for MRI of neck is not met to evaluate status of VP shunt. [Inmate] with vague chronic symptoms headache dates back to 2013 based on Cares note. No focal neurological deficit. Recommend 1. Determining the necessity and diagnostic necessity of MRI of neck." (*Id.* at 35.) In her subjective notes, NP DeMello noted that Plaintiff was "unhappy with determination, states he wants the cyst evaluated since it should be evaluated every 2 years per neurology especially with [the] shunt being clogged." (*Id.* at 32.) She noted that Plaintiff claimed the shunt became clogged when he was sucker punched in 1995, after which, the cyst began to grow, and an MRI from August 14, 2015 showed it was "3 x 2 cm size and indenting left temporal fossa anteriorly." (*Id.*) Plaintiff reported seizures and "losing time," but said he was unsure of when he last had a seizure or last lost time. (*Id.*) He also stated he had been studying Hebrew, the Bible, and legal studies and was having problems with comprehension. (*Id.*)

On May 10, 2019, NP Oyuki Coronado submitted a Consult Request for Plaintiff to have an MRI. (*Id.* at 37.) She noted that Plaintiff was to be monitored on site since the last MRI "was ATP," and Plaintiff now had "unbearable headaches, dizziness, pain and pressure behind the left eye, and memory loss/issues." (*Id.*) The MRI request was denied per S. Stacy based on "no[] evidence of shunt malfunction. Consider optometry evaluation due to eye complaints[] and gathering further information about the patient's complaints of headaches and dizziness." (*Id.* at 40.)

On May 29, 2019, NP Ende informed Plaintiff during a follow-up chronic care visit that his MRI request had been denied. (Doc. 120 ¶ 15.)

**IV.    Defendants' Motion for Summary Judgment**

    **A.    Eighth Amendment Legal Standard**

To prevail on an Eighth Amendment medical care claim, a prisoner must demonstrate that a defendant acted with "deliberate indifference to serious medical needs."

*Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective prong and a subjective prong. For the objective prong, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted). Examples of a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60.

For the second, subjective prong, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. An official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; to satisfy the knowledge component, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted), or when they fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. California Dep't of Corrs.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate

indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

Finally, even if deliberate indifference is shown, to support an Eighth Amendment claim the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

## B. Discussion

Defendants do not argue that Plaintiff's arachnoid cyst, for which he has a ventricular shunt, is not a serious medical need. The evidence also shows that, in 2012, Dr. Marsella recommended MRI monitoring every two years; in November 2016, Dr. Elijah ordered an MRI; from at least February 2017 through May 2019, Plaintiff made complaints of headaches, dizziness, pain, tinnitus, and pressure behind his left eye that he believed were due to the cyst and problems with his shunt; and, in addition to other recommended care, in October 2017, February 2018, October 2018, and May 2019, three different Corizon providers, NPs Bass, DeMello, and Coronado, submitted consultation requests for Plaintiff to have an MRI. This evidence shows that Plaintiff's providers believed his cyst and related complaints were worthy of comment or treatment. *McGuckin*, 974 F.2d at 1059−60. Plaintiff also creates a genuine question of fact as to whether he suffered pain and other symptoms that interfered with his daily activities. *Id.* The serious medical need prong is met, and the Court must turn to whether Defendants were deliberately indifferent to that need.

To determine whether Defendants were deliberately indifferent, the Court must take an individualized approach that accounts for the duties, discretion, and means of each

Defendant. *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). The Court must look at "whether [each] individual defendant was in a position to take steps to avert the [harm] but failed to do so intentionally or with deliberate indifference." *Id.*

### 1. Dr. Elijah

Defendants argue that Plaintiff cannot show that Dr. Elijah was deliberately indifferent to any serious medical needs associated with his cyst and shunt because she did not refuse examination and treatment; rather, she examined the shunt, determined it was not out of place, and found that no further testing was required. (Doc. 119 at 9–10.) Defendants also argue that Plaintiff cannot show he suffered any harm due to Dr. Elijah's alleged indifference. (*Id.* at 10.)

The evidence shows that after she ordered an MRI for Plaintiff's cyst in November 2016, Dr. Elijah saw Plaintiff three times for complaints about his cyst and alleged shunt displacement. First, on March 31, 2017, she saw him for a scheduled sick call regarding his complaint that his shunt had become stretched out and displaced while exercising on February 4, 2017. (Doc. 120-1 at 18.) At this visit, she recorded Plaintiff's medical history concerning his cyst and shunt; examined Plaintiff and noted no swelling or asymmetry of his face and neck; and palpated the area of the shunt and noted no tenderness or change from the last evaluation. (*Id.*) She also addressed Plaintiff's concerns at length and informed him of her findings that there was no swelling, fluid collection, or thinning along the easily palpable tract of the shunt. (*Id.*) Additionally, she increased Plaintiff's seizure medication and noted to follow up with optometry regarding his eye pressure complaints. (*Id.*)

At the May 3, 2017 visit she noted that Plaintiff was still "adamant" that there was a malfunction of his shunt and swelling to the left side of his neck. She did not examine him due to his irritability. (*Id.* at 23.)

Finally, at a chronic care visit on July 18, 2017, she addressed Plaintiff's "black outs," which she explained could be due to his not taking his seizure medication, and, when Plaintiff again became argumentative about his shunt, she reiterated that there was no

noticeable abnormality—as there would be if his shunt had been damaged—either on his prior physical/clinical exam or on visual inspection that day.  (*Id.* at 28, 31.)

Taken together, these facts show that Dr. Elijah regularly responded to and did not deliberately disregard Plaintiff's serious medical needs associated with his cyst and shunt. Plaintiff argues that Dr. Elijah did not examine him for seven weeks after the February 4, 2017 incident in which he alleges his shunt was damaged.  (Doc. 124 at 9.)  But there is no evidence that Dr. Elijah was responsible for scheduling prisoner medical visits or that she had any knowledge of Plaintiff's shunt complaints prior to his March 31 appointment. Additionally, because Dr. Elijah's physical examination confirmed that Plaintiff's shunt was still in place and Plaintiff had no swelling or signs that the shunt had been damaged, there is no genuine issue of material fact that the delay in being seen caused Plaintiff harm.

Plaintiff also argues that Dr. Elijah improperly relied on his November 14, 2016 MRI to determine that he did not require further tests or assessments of his shunt, even though his injury occurred on February 4, 2017.  (Doc. 124 at 9.)  The evidence does not show, however, that Dr. Elijah relied on the prior MRI to determine that Plaintiff's shunt was still in place.  Instead, she explained to Plaintiff that any change to his shunt would be obvious from his physical/clinical exam or on visual inspection, both of which showed no change.  (Doc. 120-1 at 28.)  There is also no medical evidence to support that a new MRI was required to determine if Plaintiff's shunt had become damaged or displaced, and although Plaintiff clearly believed an MRI was needed to make this determination, a difference of opinion is insufficient to show deliberate indifference.  *Sanchez*, 891 F.2d at 242.  Additionally, the x-rays NP Ende subsequently ordered confirmed nearly a year after Plaintiff's last visit with Dr. Elijah that the shunt was "unremarkable."  (Doc. 120-2 at 22.) Plaintiff therefore cannot show he was harmed by Dr. Elijah's failure to conduct further tests to assess his shunt.

Plaintiff also argues that Dr. Elijah never discussed his December 8, 2016 MRI findings showing he had sinusitis and a new "sinus mucous retention cyst."  (Doc. 124 at 10; Doc. 120-1 at 3.)  But Plaintiff fails to present any medical evidence that his sinusitis

and sinus mucous retention cyst were serious medical needs that required additional treatment at the time or that he suffered any harm due to Dr. Elijah's alleged failure to separately address these issues.

Because Plaintiff fails to create a triable issue of fact that Dr. Elijah was deliberately indifferent to his serious medical needs or that any actions or inactions of Dr. Elijah caused him harm, the Court will grant summary judgment to Dr. Elijah and dismiss her from this action.

### 2. UMT Director Ladele

Plaintiff's claim against Defendant Ladele is based on Ladele's alleged denial of NP DeMello's consultation requests for Plaintiff to receive an MRI. (*See* Doc. 80 at 5−6.) Defendants argue that this claim is based on Plaintiff's false assumption that Ladele was responsible for those denials. (Doc. 119 at 11.) Defendants cite to Ladele's September 23, 2019 Response to Plaintiff's Motion to Compel and Ladele's attached declaration, in which he avows he is employed by Corizon as a Regional Medical Director and confirmed through his review of Plaintiff's medical records that he was not involved "in any medical decisions regarding Plaintiff's injuries, medical concerns, or outside consultation requests," and "played no role in [Plaintiff's] medical care." (Doc. 116; Doc. 116 at 5 (Ladele Decl.) ¶¶ 3, 4.) Defendants argue that Plaintiff merely added Ladele to his First Amended Complaint based on Ladele's title as Regional Medical Director, but Plaintiff cannot show he suffered any injury attributable to Ladele. (Doc. 119 at 11.)

In Response, Plaintiff cites to Ladele's declaration in another civil rights action in which Ladele avowed that his involvement in prisoners' medical care "includes evaluation for offsite consultation requests." (Doc. 124 at 10; Doc. 124 at 28 (Ladele Decl.) ¶ 3.) Plaintiff also argues, without support, that "within this case[, Ladele] admitted to being head of the UMT." (Doc. 124 at 10.) But showing that Ladele's duties included evaluating consultation requests and directing the UMT is not enough to show that Ladele was both aware of Plaintiff's serious medical needs and was personally involved in denying specific consultation requests in Plaintiff's case. Absent this showing, Plaintiff cannot prevail on

his § 1983 claim, for which he must produce "facts, not simply conclusions [showing] that [Ladele] was personally involved in the deprivation of his civil rights." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). Accordingly, the Court will grant summary judgment to Defendant Ladele and dismiss him from this action.

### 3. Corizon

To maintain a claim against Corizon as an entity, Plaintiff must meet the test articulated in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690-94 (1978); *see Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities acting under color of state law). Accordingly, Corizon may only be held liable under § 1983 for its employees' civil rights deprivations if Plaintiff can show that an official policy or custom caused the constitutional violation. *Monell*, 436 U.S. at 694. To make this showing, Plaintiff must show that (1) he was deprived of a constitutional right; (2) Corizon had a policy or custom; (3) the policy or custom amounted to deliberate indifference to Plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

#### a. Constitutional Deprivation

Defendants argue that Plaintiff cannot show a constitutional deprivation because there is no evidence Corizon failed to provide continuity of care for Plaintiff's chronic medical needs, including his seizures and shunt. (Doc. 119 at 8.) Corizon argues that Plaintiff's failure to take his seizure medications as directed, not Corizon's deliberate indifference, inhibited Plaintiff's healing process. (*Id.* at 8−9.) Corizon also argues that Plaintiff's MRI requests were not denied due to financial reasons but due to findings of no medical necessity, ATPs were issued, and Plaintiff was told on multiple occasions that his shunt was in place and there was no cause for concern. (*Id.* at 9.)

The evidence before the Court is sufficient to make an initial showing that Plaintiff received appropriate medical care for his seizures and complaints about his shunt. First, as to Plaintiff's seizures, it is undisputed that Plaintiff received chronic care visits and anti-

seizure medications. The medical records show that, on March 31, 2017, when Plaintiff complained that his seizure medication was not working, Dr. Elijah increased Keppra, and later discontinued Keppra and Meclizine only at Plaintiff's request when he reported not taking these medications for several months with no seizures or increase in dizziness. (Doc. 120 ¶¶ 4, 5.) Although Plaintiff later reported blackouts, which Dr. Elijah opined could be due to seizures, Plaintiff, himself, refused seizure medications, insisting that his issues were solely related to his shunt. (*Id.* ¶ 6.) Then, in October 2017, Plaintiff reported only one seizure, and in January 2018 reported no seizures and that he could not recall his last seizure. (Doc. 120 ¶¶ 7−8.)

Second, as to Plaintiff's shunt, the medical record evidence shows that, after Plaintiff complained that his shunt had become displaced in February 2017, he was referred to a provider and received examinations, including palpations of his neck and shunt, visual inspections, and a later x-ray, all of which showed that his shunt had not become displaced while exercising, as Plaintiff claimed. As already discussed, Plaintiff's lay opinion that an MRI was needed to make this determination does not create a question of fact that any Corizon provider was deliberately indifferent to or failed to provide proper care in response to Plaintiff's shunt complaints.[6]

Defendants fail, however, to discuss Plaintiff's allegations that he did not receive proper medical care for his arachnoid cyst—including MRI monitoring every two years, as recommended by Dr. Marsella—or for his ongoing cyst or shunt-related complaints. Even if Defendants had met their initial burden of showing that Plaintiff received appropriate care for these issues, questions of fact prevent the Court from finding that Corizon's repeated denials of its medical providers' MRI requests were not deliberately indifferent to these serious medical needs. First, the evidence shows that when NP Bass saw Plaintiff for a chronic care visit on October 23, 2017, NP Bass noted to "[r]esearch frequency of MRIs to monitor temporal cyst (most recent 2016)." (Doc. 120-1 at 36.) Although there

---

[6] Defendants did not file a Reply to Plaintiff's Response, and the time to do so has elapsed.

is no MRI request in evidence associated with this visit, when NP Bass next saw Plaintiff on February 12, 2018, it was for an ATP that called for "more comprehensive exam before re-submitting MRI request." (Doc. 120 ¶ 8.) Drawing all inferences in Plaintiff's favor, NP Bass submitted an MRI request because he believed an MRI was medically necessary under the circumstances, but his request was denied. Also, when NP Bass saw Plaintiff regarding the ATP, he noted that Plaintiff reported episodes of vertigo that were increasing, left-sided tingling, and tinnitus, and he planned to resubmit the MRI request. (Doc. 120-2 at 5−6.)

Defendants are correct that Corizon's denial of the next (second) MRI request was ostensibly because "[t]he medical necessity for repeat MRI of head for intermittent vertigo is not met." (*Id.* at 15.) In particular, the denial noted "[n]o evidence of neurological deficit or worsening severe headache or vomiting," and that "[t]ypically sphenoid cysts do not cause vertigo and is an incidental finding." (*Id.*) The ATP called for medical to "[c]onsider Hall pike testing, review of [Plaintiff's] medications and short trial of meclizine." (*Id.*) There is no evidence, however, that the ATP was followed, and when Plaintiff was next seen by NP DeMello on September 27, 2018, he reported increased headaches, passing out, fatigue, loss of balance, and tremors. (*Id.*) Further, during her objective exam, NP DeMello palpated "some of [the indents Plaintiff] was describing on lateral mid neck portion of shunt tubing." (*Id.* at 26.) She assessed "[v]entricular shunt status" and "[u]nspecified convulsions" and requested an MRI of the head and neck, this time "for VP shunt." (*Id.* at 26−27.) This request was also denied for an ATP, this time based on the lack of medical necessity "to evaluate status of VP shunt," Plaintiff's "vague chronic symptoms headache dates back to 2013,; and "[n]o focal neurological deficit. The ATP directed medical to "determin[e] the diagnostic necessity of MRI of neck." (*Id.* at 35.)

Finally, on May 10, 2019, NP Coronado also submitted an MRI request, this time noting that the previous ATP called for Plaintiff to be monitored on site,[7] and Plaintiff now

---

[7] It is not clear from the evidence provided whether this was the ATP of NP DeMello's September 2018 MRI request or if NP Coronado was referring to another, intervening request that had also been denied, this time with the ATP that Plaintiff be

reported "unbearable headaches, dizziness, pain and pressure behind the left eye, and memory loss/issues." (*Id.* at 37.) This request was also denied, this time based on "no[] evidence of shunt malfunction," and the ATP called for Plaintiff's providers to "[c]onsider optometry evaluation due to eye complaints[] and gather[] further information about the patient's complaints of headaches and dizziness." (*Id.* at 40.)

Based on Dr. Marsella's recommendation that Plaintiff be given an MRI every two years to monitor his arachnoid cyst and at least four consultation requests by at least three different medical providers between October 2017 and May 2019 that Plaintiff have an MRI to monitor his cyst and/or the placement of his shunt, a reasonable jury could find that Corizon's repeated denials of MRIs and its repeated ATPs, some of which only vaguely requested more monitoring or documentation, was deliberately indifferent to his serious medical needs. Defendants' failure to provide any evidence regarding the identity and medical qualifications of the staff members who denied these requests or any medical opinion evidence to establish the propriety of these denials is noteworthy, particularly where the evidence shows Plaintiff's direct medical providers made the requests based on their direct examinations and documentation of Plaintiff's symptoms. Courts routinely find that failure to follow a treating specialist's or even a treating physician's recommendation may amount to a course of treatment that is medically unacceptable. *See Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (denying summary judgment where prison officials "ignored the recommendations of treating specialists and instead relied on the opinions of non-specialist and non-treating medical officials who made decisions based on an administrative policy"); *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) (where the treating physician and specialist recommended surgery, a reasonable jury could conclude that it was medically unacceptable for the non-treating, non-specialist physicians to deny recommendations for surgery), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (the defendant physician's refusal to follow the advice of treating specialists could

monitored on site.

constitute deliberate indifference to serious medical needs); *McNearney v. Wash. Dep't of Corrs.*, C11-5930 RBL/KLS, 2012 WL 3545267, at *26 (W.D. Wash. June 15, 2012) (finding, in granting a preliminary injunction for specialist treatment, that the prisoner plaintiff showed a likelihood of success on the merits of her Eighth Amendment claim where the defendants failed to follow an orthopedic surgeon's strong recommendation for further orthopedic evaluation).

A reasonable jury could also find that Corizon caused Plaintiff harm by failing to approve an MRI to monitor his cyst and assess the condition of his shunt while, for over two years, he complained of dizziness, headaches, pain, pressure, vertigo, and cognitive issues. *See S. Cal. Housing Rights Ctr. v. Los Feliz Towers Homeowners Ass'n*, 426 F. Supp. 2d 1061, 1070 (C.D. Cal. 2005) (a declarant has personal knowledge of his or her own symptoms); *Estelle*, 429 U.S. at 103 (Eighth Amendment applies even to "less serious cases, [where] denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose"); *McGuckin*, 974 F.2d at 1060 (pain and anguish suffered by prisoner constituted harm sufficient to support a § 1983 action).

Because there are questions of fact whether Corizon was deliberately indifferent to Plaintiff's serious medical needs and thereby caused Plaintiff harm, there is a triable issue of fact whether Plaintiff suffered a constitutional violation, thus satisfying the first *Monell* prong.

### b. Policy or Custom

A policy is "a deliberate choice to follow a course of action" made by the officials or entity "responsible for establishing final policy with respect to the subject matter in question." *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992). A policy can be one of action or inaction. *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006). A "custom" for purposes of municipal liability is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it

must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). While one or two incidents are insufficient to establish a custom or practice, the Ninth Circuit has not established what number of similar incidents would be sufficient to constitute a custom or policy. *See Oyenik v. Corizon Health Inc.*, No. 15-16850, 2017 WL 2628901, at *2 (9th Cir. June 19, 2017) (a reasonable jury could conclude that at least a dozen instances of defendant Corizon denying or delaying consultations and radiation treatment for cancer patient over a year amounts to a custom or practice of deliberate indifference) (citing *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992)). But "[t]here is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual." *Id.* Whether actions by entity officers or employees amount to a custom "depends on such factors as how longstanding the practice is, the number and percentage of officials engaged in the practice, and the gravity of the conduct." *Mi Pueblo San Jose, Inc. v. City of Oakland*, C-06-4094 VRW, 2006 WL 2850016, at *4 (N.D. Cal. Oct. 4, 2006).

Defendants do not argue that Corizon's repeated denials of MRI consultation requests are insufficient to show a policy or custom of denying provider-recommended medical care. Instead, they merely argue in conclusory fashion that Plaintiff cannot show "that Corizon acted under a policy of deliberate indifference." (Doc. 119 at 9.) In his Response, Plaintiff points to an Order in the class action *Parsons v. Ryan*, in which this District found that ADC's and Corizon's failures to meet agreed-upon medical performance measures posed a "health and safety danger" to prisoners and that, between 2014 and 2017, ADC assessed over 2 million dollars in sanctions against Corizon for failing to comply with its contractual obligations for delivering prisoner health care. 2008 WL 3239691, *1, *7, No. CV 12-0601-PHX-DKD (June 22, 2018). (Doc. 124 at 8, 22, 24.) Plaintiff argues that *Parsons* shows Corizon has a pattern and practice of failing to provide necessary medical care to prisoners. (*Id.* at 8.) Plaintiff does not point to any more specific evidence, outside the facts in this case, to show that Corizon had a policy or

practice of denying outside consultation requests, including MRI requests, as occurred in this case. The evidence is, however, enough to create a question of fact as to the policy/custom showing. Corizon officials denied four separate requests for Plaintiff to have MRIs. These denials were not unique or isolated events that could be attributed to rogue employees; they occurred over a two-year period, pertained to requests by at least three different medical providers, and—where identified in the record—were decided by at least two different staff members of unknown qualifications, M. Bartels and S. Stacy. The ATPs largely called only for more monitoring and documentation of issues already clearly set forth in the medical records or for alternate tests, such as "Hall pike testing," an optometry exam, or reviews of medications that the available evidence does not show ever occurred. On this record, a reasonable jury could find that denials of MRI requests and appropriate medical care were not the exception to Corizon's policy, but the rule, and thereby constituted a custom or practice of deliberate indifference. *See Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1194–95 (9th Cir. 2002) (whether a policy or custom exists is normally a jury question).

### c. Deliberately Indifferent Policy/Moving Force

Because deliberate indifference is exhibited where prison officials deny or delay medical treatment and harm results, *see Wood*, 900 F.2d at 1334, a policy or practice that denies or delays specialist and physician-recommended treatment for a serious medical need and thereby causes harm constitutes a deliberately indifferent policy.

To establish that a policy or custom is also the "moving force" behind a constitutional violation, a plaintiff must demonstrate a direct causal link between the policy or custom and the constitutional deprivation. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). The Court has already found a genuine issue of material fact as to whether Corizon had a policy or custom of denying provider-recommended care and that Plaintiff suffered harm in the form of ongoing and worsening headaches, dizziness, pain, and cognitive issues while awaiting proper evaluation and treatment. On this basis, the moving-force element is satisfied. *See id.* at 405 ("the

conclusion that the action taken or directed by the [entity] . . . itself violates federal law will also determine that the [entity] action was the moving force behind the injury of which the plaintiff complains").

Because questions of fact exist whether Corizon had a deliberately indifferent policy that deprived Plaintiff of a constitutional right, the Court will deny Defendants' Motion for Summary Judgment on Plaintiff's Eighth Amendment claim against Corizon.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 119).

(2)     The Motion for Summary Judgment (Doc. 119) is **granted in part** as to Plaintiff's Eighth Amendment claims against Defendants Dr. Elijah and Ladele, and these claims and Defendants are **dismissed** with prejudice.

(3)     The Motion for Summary Judgment (Doc. 119) is **denied in part** as to Plaintiff's Eighth Amendment claim against Corizon.  The sole remaining claim in this action is Plaintiff's Eighth Amendment claim against Corizon.

(4)     This action is referred to Magistrate Judge John Z. Boyle to conduct a settlement conference.

(5)     Defense counsel shall arrange for the relevant parties to jointly call Magistrate Judge Boyle's chambers at 602-322-7670 within 14 days to schedule a date for the settlement conference.

Dated this 9th day of April, 2020.

_David G. Campbell_
David G. Campbell
Senior United States District Judge